UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  07-21564-CIV-HUCK/SIMONTON


CARLOS PINILLIA, and others
similarly situated,

      Plaintiff,

vs.

NORTHWINGS ACCESSORIES
CORP., a Florida corporation, and
LUIS J. MORELL, individually,

      Defendants.

_____/


**ORDER GRANTING DEFENDANT NORTHWINGS ACCESSORIES CORP.'S MOTION
FOR SUMMARY JUDGMENT**

      THIS CAUSE is before the Court on Defendant Northwings Accessories Corp.'s ["NAC"]
Motion for Summary Judgment, filed October 10, 2007 [D.E. #67].  The Court has reviewed the
Motion, Plaintiff's Response thereto, Defendant's Reply, and the pertinent parts of the record.  The
Court is duly advised in the premises.  For the following reasons, the Motion is GRANTED.

**BACKGROUND**

      NAC, an aircraft component repair company, hired Plaintiff in 2001 to work as a machinist
in its Machine Shop.  In 2003 NAC promoted Plaintiff to "Manager" of the Machine Shop, but he
was still paid on an hourly basis.  On July 18, 2005 Plaintiff signed a written employment contract
with NAC that converted him from an hourly employee to a salaried employee, and Plaintiff stopped
keeping track of his hours at this time.[1]  The "Duties and Responsibilities" portion of this contract
states that Plaintiff "shall initially serve as Mechanical Engineer/Machine Shop Manager and shall
fulfill such other duties as Employer shall assign from time to time.  Employee is responsible for the

_____

[1] A copy of the agreement is attached to NAC's Motion.  *See* D.E. #68-5.

efficient operation of the machine shop as well as the design and manufacturing of tools and fixtures. In addition, he will also be responsible for the metrology functions in support of the reverse engineering and the development of FAA DHR repairs."  Plaintiff was to receive an annual salary of $75,000 under this contract.  NAC terminated Plaintiff on February 21, 2007.     Plaintiff filed this suit on June 20, 2007 "on behalf of himself and other current and former employees of Defendant similarly situated to him" under the Fair Labor Standard Act ("FLSA").  D.E. #1.  Plaintiff amended his complaint to include as a defendant Luis Morell, who was president and general manager of NAC (D.E. #15-2), but later voluntarily dismissed him from the case (D.E. #61; D.E. #62).  The only issue in NAC's Motion for Summary Judgment, and the only issue remaining in this case, is Plaintiff's claim for overtime wages under the FLSA. This Court has jurisdiction to hear the FLSA claim under 29 U.S.C.A. § 216(b), which allows plaintiffs seeking unpaid minimum wages or unpaid overtime wages to maintain a suit against an employer in "any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."

## ANALYSIS

### A.      Legal Standard

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997).  An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Allen*, 121 F.3d at 646.  "In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor."  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (citations omitted).  "The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to

2

determine the proper one." *Id.* (quoting *WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988)).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252-53.

Further, while the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment.  *Id.* at 252.  A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative, is not enough.  *Id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

**B.      Analysis**

The FLSA was designed to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C.A. § 202.  According to the FLSA, an employee covered under the Act must receive overtime pay "at a rate not less than one and one-half times the regular rate at which he is employed" if he works a workweek longer than forty hours.  *Id.* at § 207(a)(1).  There are exceptions to this overtime wage requirement – among those exceptions, the overtime wage requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* at § 213(a)(1).

In his Amended Complaint, Plaintiff seeks overtime wages pursuant to section 207(a)(1). NAC argues it is entitled to judgment as a matter of law on this claim, as the record reveals no genuine issue that Plaintiff cannot recover such wages.  This is because, NAC claims, Plaintiff falls into at least one of the exceptions to section 207(a)(1): the "executive" exception and/or the "professional" exception.  For Court considers NAC's arguments in turn.

**1. The "Executive" Exception to the FLSA's Overtime Wages Requirement**

NAC argues there is no genuine debate that Plaintiff, in managing the Machine Shop, qualified as an "executive" within the meaning of the FLSA overtime wage exemption. "Exemptions under the FLSA are to be construed narrowly against the employer who asserts them." *Jeffery*, 64 F.3d at 594; *see also, e.g.*, *Avery v. City of Talladega, Ala.*,  24 F.3d 1337, 1340 (11th Cir. 1994) ("We construe overtime exemptions [under the FLSA] narrowly, against the employer."). "The

employer has the burden of showing that it is entitled to the exemption." *Jeffery*, 64 F.3d at 594.

As mentioned above, the FLSA overtime wage exemptions include "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C.A. § 213(a)(1). In determining whether there exists a genuine issue as to whether Plaintiff qualified as an "executive" within the meaning of section 213(a)(1), the Court looks to applicable caselaw and to the Code of Federal Regulations. "Congress expressly authorized the Secretary of Labor to define the scope of the executive, administrative, and professional employee exemptions [in section 213(a)(1)]." *Avery*, 24 F.3d at 1340 (citation omitted). "'Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Id. (*quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

According to the Code of Federal Regulations ("CFR"), the term "employee employed in a bona fide executive capacity" means any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. In his Response to NAC's Motion, Plaintiff concedes that he met the first and third criteria. *See* D.E. #82 at 10. However, he claims that genuine issues exist as to whether he met the second and fourth criteria. *Id.*

**I.     The fourth criterion in the "executive" exemption analysis: Plaintiff's role in the hiring, firing, advancement, or promotion of other employees**

NAC claims that Plaintiff satisfied the fourth criterion in the "executive" exemption analysis because his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100.

Based on the record, it is clear that Plaintiff's suggestions and recommendations as to personnel decisions were indeed given particular weight. Plaintiff was the sole person to determine whether applicants for the Machine Shop were qualified for the position. Pl.'s Depo., D.E. #68-3 at 79, 193-94. No one else performed this function or reviewed Plaintiff's determination as to whether the applicant was qualified. Linette Torres Depo., D.E. #68-7 at 3; Cordon Depo., #83-8 at 30. Where Plaintiff found applicants to be qualified, their applications were sent to the human resources department merely for basic background checks and drug testing. D.E. #68-3 at 194; D.E. #83-8 at 30. On the occasions where Plaintiff found applicants to be unqualified, they were not hired. D.E. #68-3 at 79. Moreover, eventually Plaintiff directly received online applications from at least one the Internet site ("Career Builder") and "weeded out" unqualified applicants by himself. *Id.* at 192-93. In order for "Personnel Change Forms" to be valid (which were used for hiring, firing, and changing employees' status), Plaintiff's signature was required. Plaintiff also did performance evaluations when a subordinate requested a salary increase. *Id.* at 83-84; *see also* Cordon Depo., #83-8 at 33 (Plaintiff did performance evaluations on "all the machinists"). On occasions where Plaintiff reported to his superiors that machinists were performing poorly, at least some of those machinists were fired. D.E. #68-3 at 17-18, 91-94. Thus, there is no genuine issue that Plaintiff's suggestions and recommendations as to personnel decisions in the Machine Shop were given "particular weight."

## II.      The second criterion in the "executive" exemption analysis: Plaintiff's primary duty

Regarding the second criterion, NAC claims there is no genuine issue as to whether Plaintiff's primary duty was to manage the Machine Shop. According to NAC, it is plain from the record that Plaintiff's primary duty was to serve as Manager, and his secondary duty was to serve as Mechanical Engineer. Section 541.102 of the CFR defines "management" as including, but not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies,

machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

The CFR also offers guidance as to what constitutes an employee's "primary duty" – according to section 541.700:

> the term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Further, "[a] job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."  29 C.F.R. at § 541.2.

Here, it is clear from the record that Plaintiff "managed" the Machine Shop: he could authorize vacation time for his subordinate machinists, depending on the priority of work at the Machine Shop (Pl.'s Depo, D.E. #68-3 at 39; *see also* Torres Depo., D.E. #68-7 at 3; Cordon Depo., D.E. #83-8 at 33), was responsible for investigating and resolving discrepancies in his subordinates' time sheets (D.E. #68-3 at 38; D.E. #68-7 at 3), determined whether the Machine Shop should perform a certain job itself or out-source it, and coordinated out-sourcing as necessary (D.E. #68-3 at 145), was responsible for documenting all workplace accidents (*id.* at 154-55), provided estimates for how long it would take for the Machine Shop to complete a project as weekly Production Meetings, at which he represented the Machine Shop (*id.* at 201), assigned work to the machinists depending on the Machine Shop's priorities (*id.* at 15), was responsible for ensuring safety at the Machine Shop (*id.* at 86; Pl.'s Aff., D.E. #83-24), was the only person who determined whether applicants for the Machine Shop were qualified to be machinists (D.E. #68-3 at 79, 193-94), and on the occasions where Plaintiff found applicants to be unqualified, they were not hired *(id.* at 79), and when a subordinate requested a salary increase, part of Plaintiff's job was to do a performance evaluation (*id.* at 83-84).  Plaintiff would also  "manage [his] own time" at NAC.  *Id.* at 103.

6

Plaintiff argues that his principal, main and most important duty, his *primary* duty, was not to manage the Machine Shop but rather to "design and manufacture devices, tools, and fixtures, which are used in the repairing process of aircraft components."   In support of this argument, Plaintiff points to the fact that he spent little time on managing duties.  For example, he testified that before German Cordon became the Machine Shop's leadman in 2005, Plaintiff spent two to three hours per day on managerial tasks. *Id.* at 102-03.  After Cordon began working as leadman, Plaintiff spent only two hours per day on managerial tasks. *Id.*  However, the amount of time spent on work claimed to be exempt is not dispositive.  While the CFR acknowledges that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," "[t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b); *see also, e.g.*, *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268 (S.D. Fla. 2004).   Because the time factor is not dispositive, the Court considers additional factors in determining whether Plaintiff's primary duty was "executive" in nature.

According to Plaintiff, he could not set the hours for the Machine Shop, did not have anything to do with budget issues, could not take any disciplinary action against his subordinates on his own, could not set the Machine Shop's work priorities, and could not set wages for new hires. *See* Pl.'s Aff., D.E. #83-24.  Plaintiff and NAC also disagree as to whether Plaintiff could authorize overtime and whether Plaintiff's managerial responsibilities took up more of his time and attention than his engineering responsibilities.

Regarding Plaintiff's salary, upon his signing of the employment agreement in 2005 Plaintiff began receiving an annual salary of $75,000.  In addition to his salary, Plaintiff also received quarterly bonuses, depending on how NAC performed financially and on his own performance. Lloret Depo., D.E. #83-6 at 158-59.  The next closest salary in the Machine Shop was  Cordon's, who earned $45,760 in 2006.  In 2004, before Plaintiff became a salaried employee, Plaintiff earned $56,839.  Significantly, Plaintiff points out that  he was promoted to Manager of the Machine Shop in 2003, and remained a salaried employee.  After he signed the employment contract in 2005 (and thus received nearly a $20,000 annual salary increase, not including quarterly bonuses), his managerial duties actually decreased, and he was charged with serving as Mechanical Engineer. According to Plaintiff, "[t]his suggests that the increase in his compensation was related to his production tasks rather than his management duties and the relative importance of each to NAC."

Pl.'s Resp., D.E. #82 at 13.

Plaintiff also argues that Cordon was promoted to the position of leadman in order to take over some of Plaintiff's management responsibilities, so that Plaintiff could focus on his engineering work. Cordon confirmed that he was promoted around the same time that Plaintiff signed the employment contract. *See* D.E. #83-8 at 7. According to Cordon, when Plaintiff's position changed at that time, around 2005, Plaintiff "[became] the design engineer. [Plaintiff] was also in charge, at the same time, of the machine shop." *Id.* at 8. Cordon stated that Plaintiff's managerial duties did not change with the signing of the contract, as Plaintiff had been in charge of the Machine Shop prior to the contract. *Id.* However, after Cordon was promoted, Cordon assisted Plaintiff in ensuring the safety of the Machine Shop, checking the machinists' time cards, distributing assignments to the machinists, and generally directing the work of the machinists. *Id.* at 9-13. NAC disputes that Cordon was promoted to relieve Plaintiff of some managerial responsibilities, construing Cordon's work as "delegated" work. NAC argues that the fact that Plaintiff delegated some of his managerial duties to Cordon does not bear on whether Plaintiff's primary duty was to manage the Machine Shop.

The Court notes that in Plaintiff's "Team Member Performance Review" performed on September 6, 2006, his job title was "Machine Shop Manager," but his "Job Description/Qualifications" were described as "Machinist/Design Engineer." D.E. #83-18. The review commends *both* his work as a Mechanical Engineer (stating that his "experience in [engineering software] facilitates engineering in the design of test fixtures/tooling . . . He also performs metrology functions in support of the reverse engineering process") *and* his work as Manager of the Machine Shop (stating that he "[w]orks well with all the shop managers to coordinate priorities" and that he "maintains a clean working environment with minimal or no injuries to his workers"). The "Development Plans" for Plaintiff refer exclusively to Plaintiff's role as Manager of the Machine Shop, and he is encouraged to "expand the capacity of the machine shop by recruiting and training several machinist [sic]." Further, Plaintiff is reminded, "the machine shop must also expand in personal [sic]" to keep up with the growth of other NAC shops.

In deciding NAC's Motion, the Court must draw all reasonable inferences in Plaintiff's favor and must also construe the FLSA exemptions narrowly. The Court finds there is no genuine issue that Plaintiff "managed" the Machine Shop within the meaning of the FLSA's "executive" overtime wage exemption. However, especially considering both sides' arguments pertaining to Plaintiff's salary and the reason for Cordon's promotion, the Court finds there is a genuine issue as to whether

Plaintiff's *primary* duty at NAC was to manage the Machine Shop.

Nevertheless, the Court still finds that NAC is entitled to summary judgment on Plaintiff's FLSA claim.  This is because, as explained below, virtually any time Plaintiff was not performing "executive" exempt duties as Manger of the Machine Shop, he was performing "professional" exempt duties as a Mechanical Engineer.  Because it is permissible to aggregate these duties and find that Plaintiff's primary duty involved a combination of exempt executive and exempt professional duties, Plaintiff cannot recover overtime wages.  Thus, NAC is entitled to judgment as a matter of law.

### 2. The "Professional" Exception to the FLSA's Overtime Wages Requirement

NAC argues that even if there is a genuine issue of material fact as to whether Plaintiff's primary duty was "executive" in nature, NAC would still be entitled to summary judgment on Plaintiff's FLSA claim.  This is because, NAC argues, virtually any time Plaintiff was not performing exempt duties as a Manger he was performing duties as a Mechanical Engineer, and those engineering duties qualified him for the "professional" exemption under the FLSA.  NAC argues that the Court can aggregate the two exempt duties, pointing to 29 C.F.R. § 541.708, which states:

> [e]mployees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.

*See also, e.g.*, *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007) (adopting the view that "an employee performing duties that fall under more than one individual exemption, none of which separately represents her primary duty, may be exempt under the combination exemption if those duties, when combined, constitute her primary duty"); Brief from Secretary of the Department of Labor as Amici Curiae, *IntraComm,* 2007 WL 1285885 (Apr. 23, 2007).  For the following reasons, the Court agrees with NAC.

In determining whether there is a genuine issue as to whether Plaintiff performed exempt "professional" work when he was not performing exempt "executive" work, the Court looks first to the CFR.  Under 29 C.F.R. § 541.300(a), "[t]he term 'employee employed in a bona fide professional capacity' in [section 213(a)(1) of the FLSA]" means any employee:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging, or other facilities; and

(2) Whose primary duty is the performance of work:
  (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or

  (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

According to NAC, Plaintiff met the definition of a "learned professional" as provided in 29 C.F.R. § 541.301(a) in his capacity as Mechanical Engineer.  Under that section, to qualify as a "professional" an employee's "primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a).  Breaking this primary duty test down, there are three elements: (1) the employee must perform work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.  *Id.*  According to the CFR, "work requiring advanced knowledge" refers to "work which is  predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work."  *Id.* at § 541.301(b).  Further, "field of science or learning" includes the "traditional profession[]" of "*engineering.*"  *Id.* at § 541.301(c) (emphasis added).

Plaintiff insists that because he does not have an advanced degree in engineering, he does not fall within the professional exemption to the FLSA's overtime requirements.  However, as the CFR makes clear, one need not necessarily have completed a course of advanced education:

the [professional] exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. . . . However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

10

*Id.* at § 541.301(d); *see also, e.g., Stevins v. Provident Const. Co.*, 137 Fed. Appx. 198, 199 (11th Cir. 2005) ("The FLSA regulations do not require that an exempt professional hold a bachelor's degree; rather, the regulations require that the duties of a professional entail advanced, specialized knowledge.").[2]

Even drawing all reasonable inferences in Plaintiff's favor, and construing the exemptions to the FLSA's overtime wage requirement narrowly, as the Court must, the Court still finds there is no genuine issue that Plaintiff's work as an engineer for NAC required the sort of advanced, specialized knowledge contemplated by 29 C.F.R. § 541.301(a). Indeed, it is clear from the record that in designing tools to test repaired airplane parts, Plaintiff did meet the definition of a "learned professional." In its Statement of Undisputed Facts, NAC states the following (summarized from NAC's original language):

- NAC repairs aircraft components. It is essentially a competitor to various companies that originally produced whatever component NAC is repairing (these companies are referred to herein as Original Equipment Manufacturers, or "OEMs"). The Federal Aviation Administration requires certain tests to be performed on repaired airplane components to make sure they will be safe in flight, but because they are competitors with NAC, OEMs do not provide NAC with the specialized tools and fixtures necessary to perform these tests. Thus, NAC must engineer these tools and fixtures – this is the type of engineering work that Plaintiff performed for NAC.

- The OEMs' manuals provide specifications for the required results of these tests, such as what level of pressure the repaired parts should be able to withstand, but provide no details on how to actually build the tool necessary to perform the testing.[3] Plaintiff had to use his mechanical engineering skills and independent discretion to design these tools. Once he designed the tool, a machinist in the Machine Shop would manufacture it.

- Plaintiff was one of only three employees at NAC given the AutoCAD (Computer Aided

---

[2] However, it is worth mentioning that Plaintiff listed under the "Education" portion of his resume that he studied to be a "Machinery Designer" at a technical institute in Colombia, from 1985-1989. D.E. #83-20.

[3] Indeed, in his Response to NAC's Motion, Plaintiff stated that he "would not create designs and drawings out of the blue but would have to refer to manuals for *basic* specifications." D.E. #83 at ¶ 3 (emphasis added).

Design) engineering program, and he received a special computer allowing him to make use of that program.   AutoCAD required a special knowledge of industrial or mechanical engineering, and helped Plaintiff to prepare drawings and designs for the tools and fixtures. Although Plaintiff specifically objected to many of NAC's "undisputed" facts, Plaintiff did *not* object to any of the above statements.  *See* Pl.'s Statement of Undisputed Facts, D.E. #83 at 1.

Min Lau, NAC's Director of Engineering, submitted an affidavit describing in more detail the engineering process.  *See* D.E. #68-32.  He explained that when NAC repairs part of an airplane, it must certify that the repaired component has been properly tested to be safe in flight.  Examples of such components in need of testing are auto-pilot devices.  The companies that produce the parts used in the repairs, or OEMs, do not provide instructions on how to build the tools necessary for the testing.   Thus, Plaintiff must perform a "mechanical engineering analysis" to determine how to design the required tools, and the machinists build the tools based on his specifications.   In performing this analysis, Plaintiff "needed to understand material strength, material dimensions, and stress analysis to determine how much load could be put upon a fixture, what conditions it could withstand, and what other materials could be used to secure or fasten the component to the fixture." According to Mr. Lau, each engineering project required original thought, effort, analysis, and design because the repaired parts differed based on the type and model of aircraft being repaired. Mr. Lau stated that Plaintiff was one of only three employees given a powerful computer on which to run the AutoCAD program.[4]  Mr. Lau also stated that Plaintiff told him he had managed a Machine Shop in Colombia and had undergone at least two years of technical training in Colombia.  Indeed, under the "Education" portion of his resume, Plaintiff represented that he studied to be a "Machinery Designer"at a technical institute in Colombia from 1985-1989.  D.E. # 83-20.

In his deposition, Mike Garcia, Plaintiff's former supervisor and General Manager of the Structures Division of NAC, described Plaintiff as an "engineer" who worked in both the Structures Division and the Accessories Division of NAC.  *See* D.E. #83-4.[5]  Significantly, Mr. Garcia stated that he believed that all the engineers working under him in the Structures Division had engineering

---

[4] According to Plaintiff, he was given this program in 2005.  D.E. #83 at 4.  According to Mr. Garcia, NAC had approximately 150-160 employees in 2002 and has approximately 350-350 employees today.  D.E. #83-4 at 70.

[5] According to Mr. Garcia, the Structures Division deals with the frames and interiors of airplanes, while the Accessories Division deals with the frame, the engine, and individual component parts used throughout the airplane.

degrees. *Id.* at 11. He also believed Plaintiff had a mechanical engineering degree (although Plaintiff disputes that he told Mr. Garcia this). Further, regarding the nature of Plaintiff's engineering work, Mr. Garcia explained that while sometimes the designing of necessary tools is relatively simple, at other times the design process is quite complex. In the complex cases, the OEMs' manuals are "very vague" as to how to build the required tool – they describe the desired outcome, but not how to build the tool. Mr. Garcia indicated that often in these complex cases, the manuals do not provide specifications as to what material should be used in the creation of the tool. In such cases, "somebody with [Plaintiff's] capacity would have to figure out how strong of an equipment . . . to build to be able to sustain these loads that this fixture is going to see when it's used for testing this end component." *Id.* at 24.

Plaintiff himself agreed that in order to design the necessary tools using the AutoCAD program, he had to use "professional expertise." Pl.'s Depo., D.E. #68-3 at 59. Plaintiff also stated in his Response that "[a]lmost anyone could be a manager, but it took someone with specific and uncommon skills to do the production work performed by [Plaintiff]." Pl.'s Resp. at 12. It appears from the record that no one reviewed Plaintiff's engineering work – his tool design was submitted directly to the machinists to construct.

For the foregoing reasons, the Court finds there is no genuine issue that Plaintiff's engineering work for NAC required advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. It is clear from the record that when Plaintiff engineered specialized tools and fixtures, he performed complex work "predominantly intellectual in character" and exercised discretion and judgment. Further, the field of engineering is specifically mentioned in 29 C.F.R. § 541.301(c) as being a "field of science or learning." Florida law also regulates the field of professional engineering, and considers "mechanical engineering" to be a part of that field. *See* Fla. Stat. § 471.031; *see also id.* at 471.013 (in order to take the required tests to become licensed as a professional engineer in the state of Florida, an applicant must have graduated from an advanced engineering curriculum).

Under 29 C.F.R. § 541.708, if an employee's primary duty involves a combination of different kinds of exempt work, that employee is exempt from the FLSA's overtime wage requirements. *See Bagwell v. Fla. Broadband, LLC*, 385 F. Supp. 2d 1316 (S.D. Fla. 2005) (discussing the "combination exemption"). Thus, although there is a genuine issue as to whether Plaintiff's primary duty was "executive," NAC is still entitled to summary judgment because it is

13

clear from the record that virtually any time Plaintiff was not performing exempt "executive" work, he was performing exempt "professional" work as a Mechanical Engineer.  The Court does note that in some parts of the record, Plaintiff lumps his design duty in with his tool manufacturing duty (which would not be exempt under the FLSA).[6]  However, it is clear to the Court that Plaintiff's tool manufacturing responsibilities were minimal and did not meaningfully figure into his most important duties at NAC: managing and engineering.  For example, on his resume Plaintiff listed the following details of his experience with NAC: "Design of test equipment, Fixtures and tools needed for the repair and overhaul of aircraft components and accessories."; "Managed up to six machinists for the manufacturing of test equipment, Fixtures and tools, in-house rework and 8110 aircraft components and accessories."; and "Metrology functions in support of the reverse engineering and the development process."  D.E. #83-20.  He does not mention the manufacture of tools.  Further, in his Response to NAC's Motion, Plaintiff himself stated that he "would do the drawing [of airplane tools and fixtures] and would generally have one of the machinists actually make the part but *occasionally* he would make the part himself."  Pl.'s Resp. at 2 (emphasis added).  Plaintiff also did not object to NAC's statement that "[o]nce [Plaintiff] designed the tool, a machinist in the Machine Shop would manufacture it."  D.E. #68 at ¶¶ 50-52; D.E. #83 at 1.  According to Mr. Garcia, only on rare occasions would Plaintiff actually manufacture the tool he designed.  D.E. #83-4 at 25.  According to Mr. Lau, after Plaintiff produced an engineering drawing of the tool or fixture, he would direct one of the machinists to manufacture it.  D.E. #68-32 at 3; *see also* Cordon Depo., #83-8 at 36 (Plaintiff would only actually manufacture the tools he designed "when everybody was busy and there was no other mechanic").  It is clear from the record that Plaintiff's tool manufacturing work was of little importance to NAC – it was his skills as a Mechanical Engineer and Manager of the Machine Shop that made him valuable to NAC, and accounted for his $75,000 annual salary.

---

[6] *See, e.g.*, D.E. #83 at ¶ 13 ("[Plaintiff's] primary duty was to design and manufacture devices, tools, and fixtures, which are used in the repairing process of aircraft components."); *id.* at ¶ 3 (stating his "most important function" at NAC was "doing drawings for and preparing testing tools and fixtures.  Those were the functions that . . . made him an important employee to NAC"); D.E. #83-24 (stating his "most important tasks upon [sic] as manager were (1) design; (2) manufacture tools and fixtures and; (3) metrology.  I spent a majority of my time designing fixtures and in the production of tools and fixtures").

15

## CONCLUSION

For the reasons set forth above, and even drawing all inferences from the evidence in the light most favorable to Plaintiff, as the Court must in the context of a summary judgment motion, the Court finds no genuine issue as to whether Plaintiff is exempt from the FLSA's overtime wage requirement.  Plaintiff's primary duty at NAC was a combination of exempt executive work and exempt professional work.  Such aggregation of work is permissible under the FLSA.  Accordingly, it is hereby ORDERED and ADJUDGED that Defendant's Motion for Summary Judgment is GRANTED.

DONE and ORDERED, in Chambers, Miami, Florida, this November 13, 2007.

_____
PAUL C. HUCK

Copies furnished to:                    UNITED STATES DISTRICT JUDGE
Magistrate Judge Simonton
All counsel of record